125-1619 WC, Village of Niles, Appellant by Daniel Egan v. Illinois Workers' Compensation Comm'n et al., Garrick Mueller, Appalee, by Kenneth Lubinsky. Counsel Egan, you may proceed. Thank you. Good morning, Your Honors. Mr. Lubinsky, may it please the Court, my name is Daniel Egan, I represent the Village of Niles, the employer and the appellant in this matter. Your Honors, we have a number of things to discuss with you this morning, but I want to start with this. When we argued this matter at the Commission and in the Circuit Court, my opponent brought matters up in oral argument that have occurred since the trial of this matter, and I think such argument is improper, and I would object the same if he does that, but I don't know that it's proper to object during opposing counsel's oral argument, so I make that objection preemptively, and would object if counsel does argue matters outside the record. Your Honors, I would like to discuss with you issues of accident, causal connection, past and prospective medical, and temporary total disability, starting with accident. Mr. Egan, I'm a little confused procedurally. You're saying counsel did what? Your opposing counsel? Oh, I'm sorry, Judge. My opposing counsel argued matters outside of the record, things that have transpired since the 19B8A hearing, not today, not in his brief, but he's argued that orally before the Commission and in the Circuit Court, and I think that's improper, and I object to it if he does it today. I don't know that it's proper for me to object and interrupt opposing counsel's oral argument, so I bring it up preemptively. Well, I'm still a little bit confused procedurally, but was there any motion practice to these points you're making? No, no, no. I did not file a motion. Okay. I just don't see it. Observation over the years, I see a lot of this going on that normally would be motion practice procedure. Okay. All right.  Yeah. Okay. I just wanted to bring that up, and if I'm out of line or out of bounds, I apologize. Okay. Very good. You may proceed. Thank you. The morning of the accident in this matter, the petitioner and coworkers were tasked with moving some decorative pianos indoors for the winter. A box truck was rented for this activity, and your honors have seen it. Okay. As a question on that, decorative pianos are outside in the weather? Yes. They were done in the summer and the fall. It's probably not good for pianos, is it? No. And they probably wanted to bring them in before they did, but... It rains in the summer. I agree. They're old. Okay. Okay. They were old. Okay. Yes. Your honor, your point is very well taken, and what can I say? You know, the cows a few years ago were a thing, and so they had some pianos donated that were too expensive to repair, and they thought, well, hey, let's let the kids of the village decorate them, and we'll put them outside, and they put them outside at various locations in the village, and then they said, oh, my, the weather's bad. They said we better bring them in, and, well, they didn't get around to it until January. Okay. Thank you. So, they rented a truck, and your honors have seen a picture of that truck. It's in the record, and that truck had a bumper with steps or stairs, I don't know how I would describe them, on each side of the bumper for climbing. The petitioner testified that after moving the last piano, he closed the door of the box truck, and he jumped off the back of the bumper to the ground about four feet or so, and he claims that he was injured in doing so, and there's no testimony that he had jumped off the box truck earlier in the day. This was the only time he did it at the end of the day. There is testimony that he had used the stair or the step at previous stops. There's no one who could articulate why he did this. There's no one who could articulate how this was work-related when he jumped off, chose to jump off the back of the truck, when there was no benefit to the employer by jumping off of the truck. So for whatever reason, the petitioner had for jumping off the truck was simply of his own free will, as a matter of fact, and a matter of law, Your Honors, this is simply not an accident that arises out of and in the course of his employment, and the decision of the commission should be reversed, and we ask that Your Honors find no accident occurred in this matter. Moving on to the issue of causal connection, the incident, as indicated, occurred on January 13 of 2023, and when he went to the emergency room later in the evening, he complained of neck pain, left shoulder pain, and left hip pain. Did not complain of low back pain. His low back was not examined. There were no x-rays of the low back. He was given a return-to-work slip for, I think, five days later, I think January 18. He came back about a month and a half later to Gottlieb, complaining of different parts of his body. He complained of his low back, and he complained of his neck in addition to that. Now, what's interesting, and what is very confusing, is he was involved in a motor vehicle accident a couple weeks beforehand on Christmas Day of 2022, where he went to Gottlieb the next day, and he was examined for complaints of pain involving his low back and his neck. He received some medication, and when he returned to Gottlieb after this accident the second time, he stated that he'd been in an accident at work when he jumped off, or fell off, I'm sorry, a box truck at work in December of 22, and injured all of these body parts, and that he returned to Gottlieb in January to have his neck examined. So, we have a whole bunch of accident dates, a whole bunch of garbled histories as to what was injured, what wasn't injured, but what we don't have is any medical opinion telling us what the causal relationship is between all of these various body parts and the work injury that is alleged to have occurred. How do we go from a jump off a box truck with a neck, left shoulder, and left hip on January 13 to a history of a fall in December of 2022 involving his neck and back, when in fact that was a motor vehicle accident, not involved with work, to other complaints in February and March of low back pain, when there's simply nothing in the medical records to explain how all of this is related to the work accident. May I ask a question? Yes, ma'am. Did the employer ever authorize or pay for any treatment for the plaintiff? No. Not even that emergency room visit? Well, no, correct. Thank you. At the time of the accident, he was offered medical assistance. There was testimony that he was offered medical assistance immediately after this occurred and he declined. And then he was terminated at the end of the day and he went on his own to these various places. So there was never any demand after the fact to go for medical until later on after the case was filed. But immediately after the incident, he was offered medical assistance. I think there were, I think two of the three witnesses, respondent presented, testified that they asked if they should call 911 for him and he declined. This is not a case where you have a prior condition of good health followed by an accident, an incident, followed by a condition of ill being. This is someone who had been involved within a couple weeks prior to the accident of a, in a car accident involving his neck and his back, involving medical care for his neck and his back. And then he has this incident and he complains only of his neck, left shoulder and left hip after the accident. Six weeks or so later, he comes back in complaining of two accident dates, well, two accidents mixed into one, combined into one. He combines the car accident and the incident of jumping off the back of the truck and combining body parts. And there's no doctor who has testified that there's a causal connection between his low back and his work accident. There's no doctor who has provided evidence that this is the case. So we can't just simply look at this as a chain of events where he had a good condition of health prior to this incident followed immediately by a change in his health condition. Let me, let me, let me back up just a moment if you, if you would, how, how do you distinguish this from McAllister with regard to, you know, you're saying that his jumping from the back of the box truck was for personal, was a personal risk issue. And how is that not incidental to his specific work of that day? Is there any particular instruction given to him on, you know, policy on how to, how to get out of the back of the truck? Well, I, there was no testimony to that effect, your honor, but I think common sense would dictate when there's a truck that four feet, there's a four feet height from the bumper to the ground where the truck is provided with, with stairs or steps, what have you built into the sides of it for climbing up and down off of the truck. I think there's a little bit of common sense. And how would I distinguish this from McAllister? While McAllister, the person in McAllister was looking for, I think it was a pan of carrots. It was some, some, something that was incidental to the job and was instrumental to what the people were doing that day. They were making, well, let me stop you right there. How is this different then? Because he was on the back of the truck for no reason other than for the benefit of his employer. He was doing the work he was instructed to do. But he was, he had no reason to jump off of the truck as a part of the work. That's where the distinction is. Well, are you characterizing this jump as frolic that takes you out of that relationship? I think you could. When I see frolic though, your honor, I think of frolic and detour, you know, where they've gone off, off the course of the road, just more, more probably along the lines of horseplay or what he was doing was for his own benefit. I don't know that I would call it frolic necessarily, trying to find a point. Well, I mean, basically, I don't know that you could call it horseplay either, would you? I don't know that. I think it's somewhere in between both of those.  I mean, horseplay, he didn't involve any other coworkers.  But he, I mean, he was having, oh, oh boy, okay. I better wrap it up here. I have, what, two minutes. So I think as a matter of fact and law with regard to causation, your honors can reverse this and deny that this is compensable. Temporary total disability, your honors, there's a period of time, January 18 of 2023 to March 3 of 2023, that the commission awarded for which there's no medical opinion that he should be off work. I don't know how that the commission can do that. He proved he didn't work and we know in Gallantine that you can, you need to have more than just I didn't work for a period of time. He has to have some authorization. Nobody took him off work for that period of time. With respect to all the other period of time, again, we rely on our issues of our disputes with accident and causation. Medical, I've been before your honors many times on the issue of medical. Here, again, we believe that all of the medical should be denied. If you disagree, we're talking about the Gottlieb bill. The Gottlieb bill is about $8,000. Medicaid or public aid, someone paid $412 and the rest was forgiven. The commission, it's not really clear what the commission did, but they appear to have awarded the entire amount. Council argues that the entire amount should be awarded. We know under Tower Automotive and we know under Rocio Perez 2, excuse me, that the negotiated rate is what prevails. In this case, the negotiated rate is the $412 that was paid by Medicaid or public aid or whatever the entity was. Negotiated rate is not limited to a health insurer. Negotiated rate is what the medical provider accepts. For all of those reasons, your honors, we would request that this matter be denied or modified accordingly or remanded for modification. Thank you. Thank you, counsel. Any questions from the court? Yes, I do have one follow-up and I keep beating a dead horse here, but see if we can revive them one more time. Do you have any Illinois case law to suggest that there's an employee's method of descending from a work vehicle was found not to arise out of employment? We hear a lot of cases, truckers who step out of their cab or off the bumper checking an engine or something and twist the knee or something. I'm just wondering if you have any case law that you can point to that says there's a specific way that is not compensable for getting off of a vehicle. I don't have a specific case, but I think what matters is, and we get back to McAllister, was what they were doing reasonably anticipated as part of their employment. If they're checking an engine and they have to hop off because there's no stair provided, no step provided, and they twist their knee, I think that's completely different than here where you have a box truck with some sort of ladder or step ladder or something on the side provided that they chose to ignore and they simply hop down. There are cases. I don't know that there are appellate cases. I know there are commission cases where people have jumped off of docks instead of walking 50 feet to the stairs, but instead choose to jump off the docks and injure themselves and the commission has denied those, but those are- Those are irrelevant to our decision-making process, but one last thing, refresh my memory on this. How old is the claimant in this case and what size of guy is he? I think he's in his- I want to say he was in his 50s, but maybe I'm wrong. I was going to say late 40s, early 50s. What size of guy? Is he a heavy set guy or is he a light guy? I'm 5'6", so everyone's taller than me, right? I think he's about 6 feet-ish, 6'1". I'm not going to call him thin, I'm not going to call him overweight. He's a well-proportioned average- I mean, he's not fat, he's not thin, he's probably now 6'1", maybe 210, 215 pounds. Okay, well, the reason I ask is because I, myself, sometimes face that getting out of the back of my pickup truck, I'm thinking, I can jump off of this and then I think second about that and it's because of my size and my age, so I was just curious. I mean, if the guy's 20, he probably had no problem jumping off of that four-foot truck. If he's much closer to my age, it may at least give you pause before you take that leap of faith, so that's all I'm worried about now. It should, and yeah, I don't want to say that- again, everyone's taller than me, but I don't think he's- again, I think he's probably around 6 feet tall and he's not- Well, regardless, I think we need to move on.  We don't have time. Presiding Justice- Oh, we have- yes. I'm sorry. You made these arguments about that bill, the Goddard bill, to the commission and they rejected it. Don't we owe them deference when they determine these bills? I think the commission owes your honors deference and should follow the law, should follow Power Automotive and Perez and follow what negotiated rate has been defined to mean and negotiate- Is it in the record that Plaintiff is on Medicaid? I think it's in the bill. It's the bill itself. I don't think- Well, the bill itself says actual contractual adjustment. That was the 870-600 or whatever it was, but I thought it said Medicaid paid it. There was no actual- Well, I'm looking at- which kind of leads me to another, just a little observation. Both sides made citations to the record that I'm sure were convenient to them, but I have to point out here, and I both, so please don't feel unduly noted if that's any kind of a phrase. But for example, I think your cite to that particular thing said C-676 that I ran to our common law record, which is that's how that's cited. I rushed to page 676, much to my disappointment. Didn't seem to have much to do with the issue through what I will add. It took a bit of time, but I don't know who to blame for that, someone else or me. But ultimately, I found that IWCC-000676 was actually what- So I know, I believe what probably happened, and everybody's got to be efficient, as you're moving through these layers of appeal, you're citing the record that exists to that court, but sadly when it got here. But I'll say no more on that. Let me ask my really important question, which is, if it's in the record that it's Medicaid, and I did not see that, but you know, then isn't there a liability for reimbursement with a long tail out there? Couldn't they come back? I don't think so. I think that they- But I guess my, you know, before I overturn the commission, I'd want to know. And so if it's not really established that he's not liable for, that the worker, the plaintiff is not liable for the reduction, I'll be honest with you, I hesitate. I thought it said Medicaid, and I'm looking. Let me, what I'm looking, I was at C-694. Yes, that's the page I'm on, Your Honor. Yeah, it doesn't say Medicaid, and I just, you know, apparently the plaintiff, you know, frequents this provider, perhaps they just look at him and write down his bill. I don't know. If it's a write-down, you know, and he'll never be liable, your argument that that might be a windfall, excuse me, you know, has some grit to it, some teeth to it. If it's a Medicaid, I truly do have concerns. Now, let's simplify it. What's the law on that? Excuse me, Judge? Simplify it to get to the point. What's the law on that? I mean, is there or is there not a hold harmless? Well, we would have to hold him harmless, of course, on anything. But the law is the negotiated rate, and Medicaid can't, they can't, the provider can't reverse their charges now and say, oh, we accepted Medicaid, it should have been comp. No, they accepted Medicaid, they reduced their bills, and the bills are, whatever they are, that's the negotiated rate, and that's what is. Well, what is the effect, I think Justice Mullen is concerned with, what's the just, what's the effect of accepting that? In other words, from the provider's standpoint, I think Justice Mullen's concerned that there will be a time when this gentleman will be hauled into small claims court, and a judgment is given against him for the difference. Once you accept Medicaid, that's what you accept is your amount, you can't accept anything more for that service. Okay, so in effect, that payment is a hold harmless to the claimant. Correct. Okay, thank you. And we'll, you will get opposing counsel's view on that here. Yes, and I apologize profusely, I don't know what I did, and I do see that, Justice Mullen, that I. That's okay, it's okay, it's frequent, it's a frequent kind of a thing, and I don't mean to pick on you. No, I don't feel picked on, but I am mortified that I dismissed that. That's very kind of you. I don't like to do that, and I go through it ridiculously, and I do it myself. But one last question. So if it's a legal question, I guess I'm hearing you say, well, it's a question of law, it's not a question of fact, you don't know the commission, any deference on that. And let me just assume that's true. I guess Medicaid, just, you know, they get what they get, even if there's a third party who would otherwise be liable for the bill. Because, you know, frankly, my experience is, if you don't mind, adjudicating personal injury cases, that Medicaid liens were of great concern to counsel and court. But apparently, according to you, not in this situation. Not when it's workers' comp, I guess. Well, I think that we're discussing two different things. Personal injury cases, Wills v. Foster and Arthur v. Couture, this court has already stated in Tower Automotive, that is not the proper analysis for a workers' compensation case. For a workers' compensation case, you look to the rate, or the negotiated rate, and that is what is owed. And the collateral source rule has no effect on cases, and that's what Tower Automotive says. I argued that case, and I think Justice Holdredge is the only one left from that argument. Yes. But if I owe, whatever the amount is here, $412, and that's payable to the petitioner, the petitioner still has to reimburse Medicare, or Medicaid, excuse me. I mean, it's not that that goes away. Medicaid would be reimbursed, but the award would still be paid, if found compensable, the amount of money for the medical is still paid, and according to the act, it is paid to the petitioner, and in this case, petitioner and his attorney, and they are responsible for resolving any such liens. So Medicaid is not left out, holding the bag, if you will, not having funds. They get the 400. Back that they pay. Thank you, counsel. Okay, further questions? Okay, one quick question. Yes. Counsel, did I hear you say that you were challenging all of the medical award? I did say- But in particular, Gottlieb, Bill? My argument on medical is based upon accident and causation, and requesting that it all be denied. If your honors disagree with the employer on the issues of accident and causation, we still have the other medical bills that would be awarded pursuant to fee schedule, or 8A and 8.2, but I still have the particular issue, because it's been argued ad nauseam that I owe fee schedule on the bill for Gottlieb, because it's been paid by someone else, and in the amount of $412. So the actual bill question, putting aside the causation, you're only challenging the Gottlieb bill? Correct. So let me point out, just looking at the record, it's C-256, there's a Gottlieb Memorial Hospital bill, patient information, and it says payor is Medicaid, Blue Cross Medicaid HMO, C-256, so I think if there's any question about where the Medicaid maybe came in, that may be where that shows up. I thought I saw it somewhere, and thank you. Yeah, I see that. Okay, thank you, counsel. Counsel for Klamath, you may respond. Good morning, may it please the court, I'm Kenneth Lubinsky, I represent the appellee Garrick Mueller, and I'd ask that the court find that the commission decision on all issues was not against the manifest weight of the evidence. And I'll just go through the points raised by Mr. Egan, unless you have some questions, feel free to obviously interrupt me. As far as the arising out of, and I ask you to find that the commission decision on that was not against the manifest weight of the evidence. Mr. Egan argued that there was no benefit to the employer in the petitioner exiting the box truck by jumping off the back, and I think that's an incorrect analysis of this. As stated, they were moving pianos, this was within his job that he was doing that exact day, he was shutting the back door. One of the witnesses said that he closed the door and jumped down all in one motion, that was Kate Schneider. This was part of the job, this wasn't something separate, this wasn't a way into work, this was part of that actual job activity. So you're suggesting that his exit from the back of the truck was during his motion of pulling the truck garage door down, if you will, and he chose one of at least two or three methods of getting off the back of the truck while doing that work? Yes, it was within the course of closing this roll top door, yeah, exactly, on the back of the truck, and that's how he got down. And actually, if you look at that testimony from Kate Schneider, I mean, she sums it up as essentially one motion, closing the door, she says he closed it hard or something and jumped down afterwards. And she also said there was no rule about the way to get off of this truck. Yeah, there was the side ladder, but that's another reasonable, I believe, way to exit the truck. So to get to the mechanics here, it is a roll down door and back, okay? And so he has to leave the truck, and he chose to jump down as opposed to descend from the truck bed by a ladder that was attached to an integral part of the truck.   And that fact that it was within his job duty of closing the door distinguishes it from the cases that have been cited in the briefs. So you're saying basically it's an act of negligence, if anything? Actually, the arbitrator pointed that out in her brief. I don't agree that it was negligence, but maybe it wasn't. Why does it matter in a work comp? It does not.  It does not. But I agree that if it was not the smartest way to do it, possibly, but that's the way he exited the truck. As far as causation, I'd ask also this court to find that the commission's decision on causation was not against the manifest weight of the evidence. I guess I'll address a couple things. This prior motor vehicle accident, there were different injuries following this work accident, which included hip, shoulder. And there was some mention that there was no complaints of low back in the emergency room record. That is incorrect. If you look at the complaints on that actual date, it says his entire back. So that includes the entire back, low back, middle back, neck. It says entire back. So that is mischaracterizing the evidence to say that on the date of the emergency room visit, Mr. Mueller did not report back pain. And this is under the comments section. Pain reported to left shoulder, entire back, and left hip. And then as far as some sort of continuing complaints of pain from this motor vehicle accident, Mr. Mueller went to the emergency room. He said that his pain resolved. He didn't have any follow-up treatment. He went to work full duty. The commission and the arbitrator found Mr. Mueller credible. And then he had the subsequent accident. So I believe that this fits squarely within a chain of events analysis. He was in a condition of good health before this accident, had an accident, and had an injury afterwards. But also, you know, it's inferrable if there's a medical condition after an accident that the accident was a causative factor of the injuries. So the evidence itself in this case is sufficient, and there is no need for a medical opinion on these issues. Moving on to the TTD issue, the petitioner was. I have a question just to try to clarify here. Okay. Let's say he had a prior auto accident, which he did. Is that correct? He was involved in an auto accident.  And he sustained injuries in that auto accident. Let's say, can a chain of events be used for aggravation of a preexisting condition? I would argue that it could be. Without a medical expert. But if there is a worsening of the condition shown in the records, then yes.  Okay. Thank you. That was all. Which is what we have here. As far as TTD. You don't have that here. I thought you said you said a worsening. I thought you said he was completely back, restored to health, and got the job with Niles. What I meant was that we have the chain of events here. I'm sorry if I. Okay. I believe that the chain of events analysis does apply to this case. We had a condition of good health.  My question is. Right. Let's say it's not quote good health. We have a condition. He's working for Niles. This incident occurs, and he argues or says credibly it's worsened. Do you need. My position is that yes, the chain of events would apply to that scenario also. If there was a condition and a worsening of the condition. Correct. That would also apply to that condition. Without a medical opinion. Without a medical opinion. Is that right? Yes, that's my opinion based on my review of the case law. As far as the. I'd ask you that you also find that the commission's decision was not against the manifest. Weight of the evidence he was placed off of work at the hospital. This was a denied workers compensation case. Treatment was not being approved by the workers company. When he finally was able to return to the doctor and see a doctor. He was again placed off of work again. The arbitrator and the commission found the petitioner credible. He testified to his pain during that time. He testified to his job duties, his limitations. So I would ask that you find that. The commission's decision was not against the manifest weight on awarding the for the entire period of time. And then the gottlieb bills. The petitioner did testify that he had state insurance. I would say that Medicare and Medicaid. Are a constant source of headaches with petitioners attorneys. There's many times where we'll. Find out from HFS that they have no lien. And then months later, we'll get a notice from one of their contractual providers that they have paid a bill. And then we have to negotiate that. So I'm sorry, I couldn't quite hear you. You said you'll get a notice from a provider that says what? HFS, the Illinois healthcare provider will send us a notice, for example, that says that they have no lien. Then months later, we'll get a notice from one of their contractual insurance entities. Who they contract with to pay these bills. Saying that for those same dates, they have a lien for the medical bills. So my point is, is there is a long tail with. Things that are paid by Medicaid or Medicare that we do have to deal with as part of our practice. And I don't believe because of that. I don't believe that this Perez case that has been cited here is entirely on point. In that case, there was evidence of the fee schedule and the negotiated rate by an insurance company. We don't have that in this case. So that's why I believe that is distinguishable from our case. And I would ask that this court follow the commission and award the entire Gottlieb bill. And I'll take any questions if you have any. Why isn't that a windfall? Because of the situation we're dealing with in this case, which is we don't have what a negotiated rate was from insurance provider like we did in the Perez case. We don't have a fee schedule into evidence. The petitioner could potentially be on the hook for this entire amount of the bill. And if there is any, I believe that the village should not benefit from its own improper conduct. If there's any award to be made, it should be made airing on the side of the petitioner's claim. Further questions from the court? No, no. Okay. Thank you, counsel. Mr. Egan, you may reply. Thank you. I'll stay on the subject of the bills. And I'm going to go to page C694 of the record. And we have a detailed history of the payments and what was adjusted and what was paid. And the only payments that would be sought by Medicaid would be the payments that they made. So we know what those payments are. We have those detailed payments. What did I say? $412. And that's what is detailed by the bills in evidence as to what the payments were. Medicaid is not going to seek money in excess of what they paid. They're not allowed to collect any more than what they paid back. What I'm suggesting, if this is found compensable, is that we only owe the negotiated rate as described by Tower Automotive, the amount actually paid. And that, in this instance, is the $412. Where do you find that on C694? So you have, at the very top, payment insurance. Oh, no. That's a different visit. $113.23. You got total charges of $69.27. Then right below that, and I'm in about the middle of the page, and then it says insurance payments and adjustments. It says payment insurance $311.48. Then it says actual contractual adjustments $66.15. Total insurance payments and adjustments, the two equal, the two, the charges and the payments equal $69.27. And it's zeroed out. Okay, I'm lost then, because I'm looking at C694, and I'm not seeing any of those numbers. This is, at the very top of that page, it says guarantor number 549640, page three of three. Yes, sir. All right, I'm just, I guess I'm lost on there. Okay. It says emergency visit to Gottlieb Hospital, 1226.22. Yes. And there's three entries. Skip those. Then you see emergency visit to Gottlieb, January 13 to January 14 of 23. Yes. That's his initial visit. Okay. Discussing here. Then you see, I don't know, 10 entries of what they did to him. And then total charges $6,927.20. Right. Right below that, it says insurance payments and adjustments. Correct. Payment, insurance, $311.48. Yes, sir. That's what I'm referencing. Okay, all right. Actual contractual adjustments, $6,615.72. I gotcha. Okay. Then right below that, emergency visit to Gottlieb Hospital on 221.23 overnight to 222. Right. Same thing. Payment, insurance, $100.85. Actual contractual adjustment, $1,202.01. Total payments, $1,302.86. So they're zeroed out. The only amount that can be collected is the amount paid, which is the $100.85 and the $311.48. That's what I'm asking to be awarded. Gotcha. Thank you for walking me through that to find the right location on that page. I was looking all over as you were speaking, and I guess I overlooked. No, it's... Then I'm glad, Judge, that I could help you and you can appreciate our issues. But what counsel argued, that's all they can collect. And finally, I would disagree. I don't think that a chain of events analysis to aggravate a pre-existing condition is appropriate because how do we know what's been aggravated and what's the cause of this aggravation? So I think that that's an inappropriate analysis. And I do think medical opinion is necessary to tell the commission what's been... how it's been aggravated, if at all. And with that... Well, I have a quick... It's a continuum, isn't it, really? I mean, we have... You're arguing that he must have had some condition from the auto accident, correct? Well, when you look at his February 21 of 23 visit to Gottlieb, it's pretty clear he was complaining of ongoing symptoms from December of 22. And so how are we to know which is what? Thank you. Very good. Any questions for counsel? I'm going to muddy this one more last time. If you look at, I think it's C-737. I'm going to get to it. C-737. It's exhibit number four. Yes. On the bottom there, it shows, you know, workers' comp insurance 412.33. I'm assuming W slash off is a write-off, $7,800 and some. And it shows a balance of 4,400. Can you walk me through that one like you did? I'll try. It's actually, you know, it's a pretty good balance. I'm always torn when my opponents offer these exhibits into evidence, because it's something that was created by the petitioner's attorney. And if I object to it, then I'm being obstructive and difficult, and we can't get it done, and how dare you, and all kinds of stuff. So I'll try. The total bills for all four providers, 12,724.07. Worker comp, there's nothing after W slash C, which I'm assuming is worker comp. There's nothing in there. We paid nothing. I agree. We paid nothing. Worker comp paid nothing. Insurance paid $412.33. That's what I've said, was Medicaid. That's the amount paid to Gottlieb. W slash off, I believe, as you state judge, is write-off, $7,817. And if we go back to C694, I think if you add up the write-offs, that's what they total. Petitioner paid, there's nothing. And the balance is 4,494.01. Now, again, your honors, I've argued that the bone and joint clinic, Chicago Pain and Orthopedic Institute, and ProCare DME should be denied based upon arguments of accident and causation. So that's $4,000-ish of this bill. And the other part that I argue should not be allowed is $412. If you, the 4,494, I agree is what the bill's total pre-fee schedule and negotiated rate. But I don't believe we're required to pay $12,724. I believe you've got the balance of those three bills, whatever those three bills are per fee schedule, plus the $412, if you find this compensable. If that makes sense. I don't know if I helped or not. Yeah, yeah. So, you know, right above that boxed area that we're referring to, Loyola Gottlieb Hospital, balance is zero. So that's one. All right. Okay. Thank you. Okay. Thank you, Council. Both for this matter this morning, it will be taken under advisement and a written disposition shall issue.